IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| DOROTHY MAE MCMEANS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 2:08CV923-SRW |
| ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF OPINION**

Plaintiff Dorothy Mae McMeans brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her applications for supplemental security income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

Plaintiff completed ninth grade in May 1978 and has never worked outside of the home. (R. 112, 116). In June 1994, plaintiff was involved in a motor vehicle accident in which she was not wearing a seatbelt. She sustained multiple serious injuries, including lacerations and a fractures of her left hip socket, femur, and knee. She was taken to UAB in Birmingham, where she had multiple surgeries over a twenty-day period, including one in which a rod ("a Grosse-Kempf nail") was placed in her left femur to repair the fracture.

(R. 154-169).

In February 2002, plaintiff was diagnosed with anemia after blood testing at L.V. Stabler Hospital when she sought treatment at the emergency room for experiencing "generalized weakness" for a few weeks. She reported no pain and no other health problems, but said that she just wakes up tired and stays tired all day. She was instructed to follow up with her physician and take medicine as prescribed. (R. 240-45). On July 25, 2002, plaintiff reported to Dr. Anthony Soler for a consultative physical examination. At that time, her chief complaint was chronic anemia with fatigue. Plaintiff told Dr. Soler about the 1994 motor vehicle accident, and said that she had abdominal injuries and injury to her knee but that she had "recovered completely" from those injuries. She had normal range of motion and no tenderness in both knees. Dr. Soler determined that plaintiff could perform the exertional requirements of medium work, with no limitations other than avoiding temperature extremes and heights. Her hematocrit was within the normal range. (R. 171-75).[1]

In November 2002, plaintiff sought treatment at the emergency room for sharp low back pain which had started several hours earlier. The ER doctor prescribed Tradol and Vistaril and told her to follow up with her family doctor. (R. 235-38). She was treated in the ER on February 6, 2003, for sinusitis and bronchitis (R. 229-33), and, on March 19, 2003, for abdominal pain since the previous night (R. 224-28). Plaintiff again sought ER treatment on April 28, 2003 when she awoke with moderate pain in her right foot. X-ray results were

---

[1] This consultative examination was performed in connection with plaintiff's February 28, 2002 application for supplemental security income, in which she alleged disability due to anemia. The application was denied on August 9, 2002. (R. 40-41).

2

negative. She was diagnosed with tendonitis and prescribed Toradol. (R. 219-23). On June 24, 2003, when plaintiff presented to the ER with pain in her right thumb, she was diagnosed with arthritis in the distal phalanx of her right thumb and prescribed Naprosyn. (R. 212-17).

On September 9, 2003, plaintiff was evaluated at the UAB Emergency Department's Walk-In Clinic when she mistakenly reported to the ER for a scheduled appointment with the orthopedic department. She complained of left knee pain and swelling, particularly with exercise. The ER doctor recommended that plaintiff keep her appointment with the orthopedist, and assessed "[p]robable degenerative arthritis left knee secondary to old trauma." (R.177-78). The ER doctor at L.V. Stabler Hospital prescribed Darvocet on October 2, 2003 for plaintiff's complaint of mild to moderate headache pain. (R. 207-10). On February 9, 2004, plaintiff appeared at the ER complaining of left knee pain. Her pain intensity was "5/10." On examination, there was no joint effusion, normal range of motion and mild tenderness. Plaintiff's gait was normal. The doctor prescribed Naprosyn. (R. 202-05).

Plaintiff was treated at the ER on March 26, 2004 for an upper respiratory infection (R. 197-200) and on April 13, 2004 for vomiting and abdominal pain (R. 192-95). On May 13, 2004, she sought ER treatment complaining of left jaw "popping" for two days and mild pain. The doctor prescribed Motrin. (R. 187-90). Plaintiff was treated at the ER on November 14, 2004 for lower abdominal pain which she rated "10/10," and which had progressively worsened over the previous month. The doctor diagnosed abdominal pain and constipation and prescribed Reglan, Levsin, and Colace. (R. 180-84).

On March 2, 2005, Dr. James Colley conducted a consultative physical examination. Plaintiff's chief complaints were of left knee and hip pain. She told Dr. Colley that her left knee began bothering her soon after the motor vehicle accident. Dr. Colley noted that plaintiff had not complained of knee and hip pain in her earlier consultative examination with Dr. Solar. Plaintiff told Dr. Colley that she has to keep the left hip and knee straight all the time due to pain. Dr. Colley observed that as she was sitting in the examination, she held her left foot approximately one foot up off of the floor, and that she held it there until she lost concentration or became tired, when she demonstrated normal range of motion of the knee and hip. He noted that plaintiff's gait was normal and that she had no problem taking her shoes or socks off or getting on the examination table. Dr. Colley observed that she had mild posterior left hip tenderness, with normal range of motion of the left hip and left knee, with mild pain on range of motion. Dr. Colley noted that plaintiff's physical examination was "essentially normal" except for the mild pain on range of motion of the left knee and left hip. He concluded that she is capable of medium work. (R. 246-50).[2]

On October 27, 2005, after the nail placed in plaintiff's femur in 1994 developed ossification and plaintiff complained of pain, she was admitted to UAB Hospital for surgical removal of the nail. She was discharged on October 29, 2005 with a prescription for Lortab.

---

[2] Dr. Colley's physical examination was performed in connection with plaintiff's application for SSI benefits filed on December 13, 2004, in which she alleged disability on the basis of "anemia, bad pelvis, plastic tubes in her leg and feet, arthritis, problems walking and low blood." Dr. Colley diagnosed probable mild mental retardation, and plaintiff reported a history of depression and anxiety, but the disability claims examiner determined, after interviewing the plaintiff, that she had no medically determinable mental impairment warranting further development. Plaintiff reported that she had never been in special education, could not provide any information about her anxiety or depression, and there was no mental health diagnosis or documentation of a learning disability in plaintiff's previous file. This claim was denied on April 5, 2005. (R. 42-43, 80, 104, 250). On January 11, 2006, during administrative processing of the present claim, plaintiff confirmed that her problem is totally physical and that she does not have any mental problems. (R. 132).

She was ambulatory with a walker. (R. 261-69). On October 31, 2005, plaintiff filed the present application for supplemental security income, alleging disability since her admission to the hospital four days previously on October 27th.

On February 29, 2006, plaintiff sought treatment from Dr. Shakar at Greenville Adult and Pediatric Clinic, complaining that she could not walk without crutches due to hip and knee pain. Dr. Shakar noted pain on movement of the left hip and leg. He prescribed Relafen 500 mg twice a day and Baclofen 20 mg twice a day. He referred plaintiff to physical therapy and advised her to use a heating pad. (R. 300-01). Plaintiff attended physical therapy seven times between March 3, 2006 and March 17, 2006 at L.V. Stabler Hospital. She was scheduled to continue for two more sessions, but there is no record that she did so. (R. 281-87).

On April 18, 2006, plaintiff returned to Dr. Shakar complaining of left knee and hip pain and a rash on her groin. Dr. Shakar prescribed a topical cream for the rash, and Relafen and Baclofen for the knee and hip pain. He advised plaintiff to apply a heating pad and to continue physical therapy. (R. 298-99). On May 2, 2006, plaintiff complained of constant left leg and hip pain, and abdominal pain. Dr. Shakar prescribed Relafen, Baclofen, and Donnatal and advised plaintiff to follow up with an orthopedic surgeon. (R. 296-97). On May 23, 2006, she complained of pain on the bottom of both feet. Dr. Shakar assessed knee pain and bilateral foot pain. He advised plaintiff to eat a low calorie diet, exercise and lose weight. He told her to elevate her fee and apply a heating pad. He continued her on the Relafen and prescribed Fastin and Furosemide. (R. 294-95). On June 14, 2006, plaintiff complained of

pain in both feet and her left hip. Dr. Shakar prescribed Naproxen and Tizamidine, and told plaintiff to elevate her feet. He noted that she had an appointment on June 20, 2006 with an orthopedic doctor. (R. 292-93). On July 6, 2006, she complained of problems with her feet and left knee pain. She asked to be tested for anemia. Dr. Shakar noted that plaintiff's left knee movement was "slightly painful." He diagnosed left knee pain, Menorrhagia, Iron Deficiency and Hyperlipidemia. He noted that plaintiff did not keep her June 20, 2006 appointment with the doctor in Birmingham. He advised her to follow up with the orthopedic surgeon, and to follow a low fat, low calorie diet and exercise. He prescribed Naprosyn. (R. 230-31). Dr. Shakar treated plaintiff on July 10, 2006 for a urinary tract infection, sinusitis, hematuria and hemorrhagic cystitis. (R. 288-89).

     Plaintiff was evaluated by Dr. Davis at Alabama Orthopedic Specialists on August 8, 2006. She complained of anterior left knee pain. She had an antalgic gait, crepitus, and a positive patella grind, but no edema and no tenderness in the joint lines. X-rays showed patellofemoral arthritis. Dr. Davis diagnosed quadriceps tendonitis with calcification and patellofemoral arthritis. He prescribed a cane, anti-inflammatories, and physical therapy. (R. 307-11). Plaintiff attended physical therapy at Rehab Associates of Greenville on August 10, 2006. She was to attend PT three times a week for four weeks. (R. 315-16). On September 19, 2006, plaintiff returned to Dr. Davis and asked him to fill out paperwork "saying a hardship about her inability to work." He refused because of her noncompliance with physical therapy. Although she told him she had been doing some physical therapy, the physical therapy department reported that she had been only once. Dr. Davis encouraged

6

plaintiff to continue with therapy.  (R. 307).

Plaintiff returned to Dr. Davis complaining of left hip and left knee pain on October 31, 2006.  She had not done any physical therapy.  She was tender in the greater trochanter of her left hip, but had good range of motion in the hip.  Dr. Davis administered an injection of 80 mg of Depo-Medrol to plaintiff's left hip and prescribed physical therapy. (R. 306-07). Plaintiff attended physical therapy on January 25, 2007.  She reported constant pain at a level of 6/10.  She claimed that she was "[i]ndependent with activities of daily living with pain over the last 13 years."  The therapist noted "Patient has been referred to physical therapy on numerous occasions and only came one visit."  Plaintiff was to attend therapy two to three times a week for four weeks, but there is no indication that she returned for further therapy after the January 25, 2007 visit. (R. 312-14).

Plaintiff sought treatment from Dr. Shakar on February 28, 2007 for complaints of pain in her left side and under her left breast.  He diagnosed musculoskeletal pain.  On March 8, 2007, he treated plaintiff for pleurisy and cough.  On April 12, 2007, plaintiff complained of excessive sleeping during the daytime over the previous month, and that she did not sleep well at night.  Dr. Shakar prescribed Traxodone and Provigil, and advised plaintiff to "Avoid sleeping day time improve sleep hyg[ie]ne."  He prescribed physical therapy for plaintiff's left knee pain.  (R. 318-23).

The ALJ conducted an administrative hearing on January 31, 2008.  Plaintiff testified as follows:

> She lives in a house with her male friend and her two daughters, ages 17 and 11.  She does not help her children get ready for school and does not get out

7

of bed until after they leave for school.  She watches television all day long.  She cleans up the house "while [she is] standing up a little while."  She cannot stand for long because of her pain.  She can sweep for a little while or make up a bed.  She does not make lunch or cook supper.  She shops sometimes, but does not go to church.  She does not do anything other than watch television.  She is 5'1" and weighs 184 pounds. She has not been on prescription medications since April 2007, but she takes Extra-Strength Advil, Motrin, Tylenol, and Goody Powders, and she uses hot towels for her hip and knee.  She has pain in her left hip and knee.  She has not been to see any doctor since she saw Dr. Shakar in April 2007, because she lost her Medicaid coverage.  She has never had a driver's license, but cannot drive due to her pain.  She completed ninth grade. The lowest pain she experiences in her hip and knee is a seven or eight on a ten-point scale, and the highest is eight or nine.  Her pain affects her ability to concentrate.  She spends about four hours during each day, between 8:00 and 5:00 reclining, lying down, or using her hot towels.  She sleeps three to four hours a night and wakes up three or four times during that period because of her hip and knee pain.  After she awakens, it takes her about two hours to get out of bed.  She can sit for five or ten minutes at a time, and stand for ten minutes with a cane.  Dr. Davidson prescribed her knee brace and cane in August of 2006 and she has used both since that time.  She cannot walk a city block.  She has three steps at her house and has problems climbing them.  She can lift a gallon of milk. Cold, damp weather makes her hurt more.  She has noticed no difference in her pain since being off of her medications.  She needs help tying her shoes and putting on her pants.

(R. 343-66).[3]

On March 7, 2008, Dr. Alan Babb conducted a consultative physical examination.  Dr. Babb noted that plaintiff was "ambulating here today using a cane although I do not think it is essential."  The examination was significant for left knee pain.  However, Dr. Babb noted that "[s]he actually has no left hip pain and has completely normal range of motion of

---

[3] At the hearing, plaintiff's attorney twice claimed that plaintiff had knee surgery in January 2006.  (R. 352, 364).  The only reference in the medical record to a January 2006 knee surgery is plaintiff's report to the physical therapist.  (R. 312, 315).  However, in the history plaintiff gave to the physical therapist, she omits any mention of her October 2005 surgery. Thus, it appears that plaintiff may simply have reported the wrong date to the physical therapist.

both hips. She is wearing some kind of superficial brace around the left knee and only flexes it about 90 degrees. However, the joint is not hot and there is no crepitance noted. . . . The only joint of note is the left knee with limited flexion as noted above. There is no effusion or warmth noted in that joint. No other joints are involved and she has completely normal range of motion of the left hip." He further stated, "On exam I can really find no abnormalities, but she complains of pain." (R. 324-28). He completed a medical source opinion indicating that plaintiff is not capable of performing the full range of even sedentary work, but also indicated that he completed the form based primarily on plaintiff's subjective complaints. (R. 329-32).

      The ALJ rendered a decision on May 28, 2008. He concluded that plaintiff suffered from the severe impairment of: "status post fractures of the left hip, left leg/knee resulting from a car accident in 1994, status post surgery for hardware removal from the left leg in October of 2005, traumatic arthritis, and obesity." (R. 19). He found that plaintiff does not have an impairment or combination of impairments which meet or equal the severity of any of the impairments in the "listings" and, further, that plaintiff retained the residual functional capacity to perform medium work, "except that the claimant should never climb ladders, ropes or scaffolds" and should avoid temperature extremes and all exposure to hazards, such as dangerous machinery and unprotected heights. (Id.). Because plaintiff has never worked, he concluded that she has no past relevant work. (R. 26). Considering her age (43 at the time of the application), education (9th grade with no history of special education), her work experience (none) and residual functional capacity, he concluded that she can perform jobs

existing in significant numbers in the national economy. (Id.). Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act. On September 22, 2008, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

Plaintiff argues that the ALJ failed to apply the Eleventh Circuit pain standard to the facts of her claim. She argues that – despite the fact that her claim is "based primarily on

continued complaints of pain and limitation due to pain" – the ALJ "failed to pay even lip service to the Eleventh Circuit pain standard." (Plaintiff's brief, p. 6). In the Eleventh Circuit, a claimant's assertion of disability through testimony of pain or other subjective symptoms is evaluated pursuant to a three-part standard. "The pain standard requires '(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005)(quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)). If this standard is met, the ALJ must consider the testimony regarding the claimant's subjective symptoms. Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992). After considering the testimony, the ALJ may reject the claimant's subjective complaints. However, if the testimony is critical, the ALJ must articulate specific reasons for rejecting the testimony. Id. "The credibility determination does not need to cite "'particular phrases or formulations'" but it cannot merely be a broad rejection which is '"not enough to enable [the court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole."'" Dyer, *supra*, 395 F.3d at 1210 (citations omitted).

In reaching his determination, the ALJ did not explicitly mention "the Eleventh Circuit pain standard." He did, however, set forth the standard under which he evaluated plaintiff's complaints of pain. The ALJ stated, "In making this [RFC] finding, the undersigned has considered all symptoms and the extent to which these symptoms can

11

reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p." (R. 19). He further wrote:

> In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s) – i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques [*i.e., in the language of the Eleventh Circuit three-part pain standard, "evidence of an underlying medical condition," (the first part of the standard)*] – that could reasonably be expected to produce the claimant's pain or other symptoms [*i.e., "that the objectively determined medical condition is of such a severity that it can reasonably be expected to cause the alleged pain," (the third part of the standard)*].
>
> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. For this purpose, whenever statements about the intensity, persistence or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence [*i.e. if "objective medical evidence confirming the severity of the alleged pain arising from that condition" does not exist, (the second part of the standard)*], the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

(R. 20)(comments in italics added). The standard explicitly articulated by the ALJ includes consideration of all of the elements of the Eleventh Circuit pain standard. As noted previously, the ALJ's credibility determination "does not need to cite particular phrases or formulations" so long as it is sufficient to enable the court to conclude that the ALJ "considered [the plaintiff's] medical condition as a whole." Dyer, 395 F.3d at 1210 (citations and internal quotation marks omitted). The ALJ was not required to use the words "Eleventh Circuit pain standard" or to cite the three-part analysis set forth in Holt v. Sullivan, 921 F.2d

12

1221 (11th Cir. 1991). See Wilson v. Barnhart, 284 F.3d 1219-1225-26 (11th Cir. 2002)("We find that the ALJ properly applied the Holt pain standard, and his determination is supported by substantial evidence. Although the ALJ does not cite or refer to the language of the three-part test in Holt, his findings and discussion indicate that the standard was applied. Furthermore, the ALJ cites to 20 C.F.R. § 404.1529,[4] which contains the same language regarding the subjective pain testimony that this Court interpreted when initially establishing its three-part pain standard."). Plaintiff's insistence on "lip service to the Eleventh Circuit pain standard" is unwarranted under Eleventh Circuit law.

Plaintiff further argues that if he had properly considered the evidence, the ALJ would have "of necessity" found her to be "disabled based on pain complaints alone," because she has presented evidence of an underlying medical condition which is of such a severity that it can reasonably be expected to cause the alleged pain. (Plaintiff's brief, p. 7). However, while evidence satisfying the pain would allow a finding of disability (see Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995)), it does not mandate such a finding. Rather, if the pain standard is met, the ALJ is required to consider the testimony regarding a claimant's subjective symptoms. If he decides to reject critical testimony – which he is permitted to do – he must articulate specific reasons for doing so. Marbury, 957 F.2d at 839.

Finally, plaintiff argues that

> the ALJ's denial was based largely on Plaintiff's personality and attributes that had little if anything to do with her allegations of pain. In his decision the ALJ concludes that because Plaintiff presented with a pleasant affect to DDS

---

[4] 20 C.F.R. § 404.1529 applies to Title II disability claims. In the present case, the ALJ cited 20 C.F.R. § 416.929, the corresponding regulatory provision applicable to Title XVI SSI claims.

13

>consultative examiner Dr. Babb (R. 24), and because she displayed intact sensory-motor exam and normal hand dexterity (R. 26), she is therefore not suffering with debilitating pain. Plaintiff submits that the fact that she remains pleasant despite her well-documented pain level throughout the years since her MVA [motor vehicle accident], is rather a testament to a positive character, than evidence that she is attempting to present her case in a less than forthright manner. In attempting to discredit her testimony based on these factors the ALJ appears to be developing his own indicia for evaluating pain rather than deferring to the expert opinion evidence. . . . Plaintiff submits that the ALJ's decision is not based upon substantial evidence due to the fact that he developed an index of traits he expects Plaintiff to display if suffering with chronic pain[, or "[s]it and squirm jurisprudence"].

(Plaintiff's brief, pp. 7-8).

Plaintiff's argument entirely ignores the many other reasons articulated by the ALJ for discrediting plaintiff's testimony of disabling pain. For instance, the ALJ's credibility determination rests largely on her noncompliance with physical therapy. (R. 22, 23; see Exhibits 11F, 13F, 14F; see also R. 312 (Rehab Associates therapist's note that "Patient has been referred to physical therapy on numerous occasions and only came one visit.")). It is well-established that an ALJ may consider noncompliance as a factor in evaluating a claimant's credibility. See Ellison v. Barnhart, 355 F.3d 1272, 1275-76 (11th Cir. 2003). Additionally, the ALJ relied on the conflict between plaintiff's testimony and the activities of daily living described in Daily Activities Questionnaires completed by plaintiff and her daughter just over two months after her October 2005 surgery. (R. 25; see Exhibits 13E, 14E). "In evaluating a claimant's credibility, the ALJ may consider, among other things, the claimant's daily activities." Salazar v. Commissioner, 2010 WL 1292258, *2 (11th Cir. Apr. 6, 2010). The ALJ further noted that, with the exception of her hardware removal surgery in October 2005 (the alleged onset date), her treatment has been conservative, "consisting

14

of non-narcotic medications and brief periods of physical therapy." (R. 21). "A doctor's conservative medical treatment for a particular condition tends to negate a claim of disability." Sheldon v. Astrue, 268 Fed. Appx. 871, 872 (11th Cir. 2008)(citation omitted). The ALJ further observed that the medical evidence tends to show that plaintiff's pain has been mild to moderate in severity. (R. 21; see e.g. Exhibits 6F, 11F, 15F, 16F). An ALJ may discredit subjective complaints which are out of proportion to the medical evidence. See Robinson v. Astrue, 2010 WL 582617 (11th Cir. Feb. 19, 2010)(ALJ properly supported his credibility determination by noting, among other things, that her complaints were out of proportion to the underlying medical evidence);

Upon consideration of the entire record, the court concludes that the ALJ articulated adequate reasons, supported by substantial evidence, for his determination that plaintiff's subjective complaints are not fully credible. Plaintiff's arguments to the contrary are without merit.

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is supported by substantial evidence and proper application of the law and, accordingly, that it is due to be AFFIRMED. A separate judgment will be entered.

Done, this 28th day of May, 2010.

/s/ Susan Russ Walker  
SUSAN RUSS WALKER  
CHIEF UNITED STATES MAGISTRATE JUDGE